ROBERTSON, CHIEF OF THE FOREST SERVICE,
ET AL. *v.* METHOW VALLEY CITIZENS
COUNCIL ET AL.

No. 87–1703.   Argued January 9, 1989—Decided May 1, 1989

STEVENS, J., delivered the opinion for a unanimous Court.  BRENNAN, J., filed a concurring statement, *post*, p. 359.

*Solicitor General Fried* argued the cause for petitioners. With him on the briefs were *Assistant Attorney General Marzulla, Deputy Solicitor General Wallace, Jeffrey P. Minear, Peter R. Steenland, Jr.,* and *Vicki L. Plaut.*

*David A. Bricklin* argued the cause for respondents.  With him on the brief for respondent Methow Valley Citizens Coun-

cil was *Michael W. Gendler.* *Glenn J. Amster* filed a brief for respondent Methow Recreation, Inc.*

JUSTICE STEVENS delivered the opinion of the Court.

We granted certiorari to decide two questions of law.[1] As framed by petitioners, they are:

"1. Whether the National Environmental Policy Act requires federal agencies to include in each environmental impact statement: (a) a fully developed plan to miti-

---

*Briefs of *amici curiae* urging reversal were filed for the Institute of Law and Public Health Protection by *Steven R. Perles* and *Scott C. Whitney;* and for the Northwest Forest Resource Council et al. by *Mark C. Rutzick* and *Douglas C. Blomgren.*

Briefs of *amici curiae* urging affirmance were filed for the State of California et al. by *John K. Van de Kamp,* Attorney General of California, *N. Gregory Taylor* and *Theodora Berger,* Assistant Attorneys General, and *Clifford L. Rechtschaffen* and *Mary Gray Holt,* Deputy Attorneys General, and by the Attorneys General for their respective States as follows: *Don Siegelman* of Alabama, *Grace Berg Schaible* of Alaska, *Duane Woodard* of Colorado, *Jim Jones* of Idaho, *Neil F. Hartigan* of Illinois, *Thomas J. Miller* of Iowa, *Robert T. Stephan* of Kansas, *Frederick J. Cowan* of Kentucky, *James E. Tierney* of Maine, *James J. Shannon* of Massachusetts, *Hubert H. Humphrey III* of Minnesota, *Mike Moore* of Mississippi, *William L. Webster* of Missouri, *Mike Greely* of Montana, *Robert M. Spire* of Nebraska, *Stephen E. Merrill* of New Hampshire, *Cary Edwards* of New Jersey, *Robert Abrams* of New York, *Brian McKay* of Nevada, *Lacy H. Thornburg* of North Carolina, *Robert H. Henry* of Oklahoma, *LeRoy S. Zimmerman* of Pennsylvania, *T. Travis Medlock* of South Carolina, *Charles W. Burson* of Tennessee, *Jim Mattox* of Texas, *Jeffrey Amestoy* of Vermont, *Mary Sue Terry* of Virginia, and *Charles G. Brown* of West Virginia; for the American Planning Association by *Stephen C. Kelly;* for the International Association of Fish and Wildlife Agencies by *Paul A. Lenzini;* and for the National Wildlife Federation et al. by *Victor M. Sher, Todd D. True,* and *Tom Lustig.*

Briefs of *amici curiae* were filed for the Center for Enviromental Education by *Nicholas C. Yost* and *William A. Butler;* and for the Pacific Legal Foundation by *Ronald A. Zumbrun* and *Robin L. Rivett.*

[1] In the order granting certiorari, we consolidated this case with *Marsh v. Oregon Natural Resources Council,* No. 87–1704. See 487 U. S. 1217 (1988). Our decision in *Marsh* appears *post,* p. 360.

gate environmental harm; and (b) a 'worst case' analysis of potential environmental harm if relevant information concerning significant environmental effects is unavailable or too costly to obtain.

"2. Whether the Forest Service may issue a special use permit for recreational use of national forest land in the absence of a fully developed plan to mitigate environmental harm." Pet. for Cert. i.

Concluding that the Court of Appeals for the Ninth Circuit misapplied the National Environmental Policy Act of 1969 (NEPA), 83 Stat. 852, 42 U. S. C. § 4321 *et seq.*, and gave inadequate deference to the Forest Service's interpretation of its own regulations, we reverse and remand for further proceedings.

I

The Forest Service is authorized by statute to manage the national forests for "outdoor recreation, range, timber, watershed, and wildlife and fish purposes." 74 Stat. 215, 16 U. S. C. § 528. See also 90 Stat. 2949, 16 U. S. C. § 1600 *et seq.* Pursuant to that authorization, the Forest Service has issued "special use" permits for the operation of approximately 170 Alpine and Nordic ski areas on federal lands. See H. R. Rep. No. 99–709, pt. 1, p. 2 (1986).

The Forest Service permit process involves three separate stages. The Forest Service first examines the general environmental and financial feasibility of a proposed project and decides whether to issue a special use permit. See 36 CFR § 251.54(f) (1988). Because that decision is a "major Federal action" within the meaning of NEPA, it must be preceded by the preparation of an Environmental Impact Statement (EIS). 42 U. S. C. § 4332. If the Service decides to issue a permit, it then proceeds to select a developer, formulate the basic terms of the arrangement with the selected party,

and issue the permit.[2]   The special use permit does not, however, give the developer the right to begin construction. See 36 CFR § 251.56(c) (1988).   In a final stage of review, the Service evaluates the permittee's "master plan" for development, construction, and operation of the project.   Construction may begin only after an additional environmental analysis (although it is not clear that a second EIS need always be prepared) and final approval of the developer's master plan. This case arises out of the Forest Service's decision to issue a special use permit authorizing the development of a major destination Alpine ski resort at Sandy Butte in the North Cascade Mountains.

Sandy Butte is a 6,000-foot mountain located in the Okanogan National Forest in Okanogan County, Washington. At present Sandy Butte, like the Methow Valley it overlooks, is an unspoiled, sparsely populated area that the District Court characterized as "pristine."   App. to Pet. for Cert. 20a.   In 1968, Congress established the North Cascades National Park and directed the Secretaries of the Interior and Agriculture to agree on the designation of areas within, and adjacent to, the park for public uses, including ski areas.   82 Stat. 926, 930, 16 U. S. C. §§ 90, 90d–3.   A 1970 study conducted by the Forest Service pursuant to this congressional directive identified Sandy Butte as having the highest potential of any site in the State of Washington for development as a major downhill ski resort.[3]   App. to Pet. for Cert. 23a.

---

[2] The developer is chosen based on: (1) "[k]ind and quality of services to be offered"; (2) "[f]inancial capability"; (3) "[e]xperience and qualifications in relation to the proposed use"; (4) "[a]bility to perform according to permit terms including Federal, State, and local laws"; and (5) "[c]ontrol of private lands necessary to develop the proposed use."   U. S. Dept. of Agriculture, Forest Service, Final EIS, Early Winters Alpine Winter Sports Study 4 (1984).

[3] The 1970 report was entitled the North Cascades Winter Sports Study. Its conclusion that Sandy Butte is well suited for development as an Alpine

In 1978, Methow Recreation, Inc. (MRI), applied for a special use permit to develop and operate its proposed "Early Winters Ski Resort" on Sandy Butte and an 1,165-acre parcel of land it had acquired adjacent to the National Forest. The proposed development would make use of approximately 3,900 acres of Sandy Butte; would entice visitors to travel long distances to stay at the resort for several days at a time; and would stimulate extensive commercial and residential growth in the vicinity to accommodate both vacationers and staff.

In response to MRI's application, the Forest Service, in cooperation with state and county officials, prepared an EIS known as the Early Winters Alpine Winter Sports Study (Early Winters Study or Study). The stated purpose of the EIS was "to provide the information required to evaluate the potential for skiing at Early Winters" and "to assist in making a decision whether to issue a Special Use Permit for downhill skiing on all or a portion of approximately 3900 acres of National Forest System land." Early Winters Study 1. A draft of the Study was completed and circulated in 1982, but release of the final EIS was delayed as Congress considered including Sandy Butte in a proposed wilderness area. App. to Pet. for Cert. 26a. When the Washington State Wilderness Act of 1984 was passed, however, Sandy Butte was excluded from the wilderness designation,[4] and the EIS was released.

---

ski resort was repeated in the Joint Plan for the North Cascades area, which was issued by the Park Service and the Forest Service in 1974. See App. to Pet. for Cert. 23a.

[4] See 98 Stat. 299. In the Senate Committee Report explaining the decision to exclude Sandy Butte from the wilderness designation in the bill, the Committee made this quite remarkable comment for a legislative committee: "The Forest Service and the Department of Agriculture are directed to allow the evaluation process for the Sandy Butte development to proceed without additional delay . . . ." S. Rep. No. 98–461, p. 11 (1984).

The Early Winters Study is a printed document containing almost 150 pages of text and 12 appendices. It evaluated five alternative levels of development of Sandy Butte that might be authorized, the lowest being a "no action" alternative and the highest being development of a 16-lift ski area able to accommodate 10,500 skiers at one time. The Study considered the effect of each level of development on water resources, soil, wildlife, air quality, vegetation, and visual quality, as well as land use and transportation in the Methow Valley, probable demographic shifts, the economic market for skiing and other summer and winter recreational activities in the Valley, and the energy requirements for the ski area and related developments. The Study's discussion of possible impacts was not limited to on-site effects, but also, as required by Council on Environmental Quality (CEQ) regulations, see 40 CFR § 1502.16(b) (1987), addressed "off-site impacts that each alternative might have on community facilities, socio-economic and other environmental conditions in the Upper Methow Valley." Early Winters Study 1. As to off-site effects, the Study explained that "due to the uncertainty of where other public and private lands may become developed," it is difficult to evaluate off-site impacts, *id.*, at 76, and thus the document's analysis is necessarily "not site-specific," *id.*, at 1. Finally, the Study outlined certain steps that might be taken to mitigate adverse effects, both on Sandy Butte and in the neighboring Methow Valley, but indicated that these proposed steps are merely conceptual and "will be made more specific as part of the design and implementation stages of the planning process." *Id.*, at 14.

The effects of the proposed development on air quality and wildlife received particular attention in the Study. In the chapter on "Environmental Consequences," the first subject discussed is air quality. As is true of other subjects, the discussion included an analysis of cumulative impacts over sev-

eral years resulting from actions on other lands as well as from the development of Sandy Butte itself. The Study concluded that although the construction, maintenance, and operation of the proposed ski area "will not have a measurable effect on existing or future air quality," the off-site development of private land under all five alternatives—including the "no action" alternative—"will have a significant effect on air quality during severe meteorological inversion periods." *Id.*, at 65. The burning of wood for space heat, the Study explained, would constitute the primary cause of diminished air quality, and the damage would increase incrementally with each of the successive levels of proposed development. *Ibid.* The Study cautioned that without efforts to mitigate these effects, even under the "no action" alternative, the increase in automobile, fireplace, and wood stove use would reduce air quality below state standards, but added that "[t]he numerous mitigation measures discussed" in the Study "will greatly reduce the impacts presented by the model." *Id.*, at 67.

In its discussion of air-quality mitigation measures, the EIS identified actions that could be taken by the county government to mitigate the adverse effects of development, as well as those that the Forest Service itself could implement at the construction stage of the project. The Study suggested that Okanogan County develop an air quality management plan, requiring weatherization of new buildings, limiting the number of wood stoves and fireplaces, and adopting monitoring and enforcement measures.[5] In addition, the

---

[5] The Study recommended the following action:

"1. The County will initiate the formation of an Air Quality Control Authority or similar administrative structure pursuant to Washington State statutes.

"2. The County will develop an airshed management plan that incorporates strategies which will result in ambient air quality standards for the Methow Valley that are stricter than existing State standards. As part of

Study suggested that the Forest Service require that the master plan include procedures to control dust and to comply with smoke management practices.[6]

In its discussion of adverse effects on area wildlife, the EIS concluded that no endangered or threatened species would be affected by the proposed development and that the only impact on sensitive species was the probable loss of a pair of spotted owls and their progeny. *Id.*, at 75. With regard to other wildlife, the Study considered the impact on 75 differ-

---

the airshed management plan, the following mitigation measures will be considered:

"—Development of land use codes specifically addressing site development and project design directed at energy efficiency and air pollution control.

"—Requiring all new construction to be fully weatherized to reduce the need for supplemental heating sources (i. e., wood) beyond the central facilities heating needs.

"—Restricting the number of fireplaces and wood stoves. At a minimum, few fireplaces should be allowed in accommodations constructed for tourist use.

"—Encouraging the use of alternative, non-polluting energy sources.

"—Establishing a certification mechanism for wood stoves and fireplace inserts.

"—Establishing an air pollution monitoring system specifically designed to alert local residents to impending pollution episodes and to record long term changes in air quality levels. Such long term data will be used to evaluate the success or failure of the mitigation and impose more stringent measures if standards are violated.

"—Development of enforcement measures to assure that standards will be met." Early Winters Study 68–69.

[6] The Study recommended the following on-site, air-quality mitigation measures:

"1. The Master Plan will require prompt revegetation of all disturbed areas and the mandatory application of dust control measures (e. g., rocking and oiling) on unpaved construction roads.

"2. The construction phase will follow established Forest Service/State of Washington smoke management practices identified in the Washington State Smoke Management Plan. The Master Plan will identify opportunities for utilization of waste wood, generated by the project, thereby minimizing open burning." *Id.*, at 69.

ent indigenous species and predicted that within a decade after development vegetational change and increased human activity would lead to a decrease in population for 31 species, while causing an increase in population for another 24 species on Sandy Butte. *Ibid.* Two species, the pine marten and nesting goshawk, would be eliminated altogether from the area of development. *Ibid.*

In a comment in response to the draft EIS, the Washington Department of Game voiced a special concern about potential losses to the State's largest migratory deer herd, which uses the Methow Valley as a critical winter range and as its migration route. *Id.*, at Appendix D (letter of November 18, 1982). The state agency estimated that the total population of mule deer in the area most likely to be affected was "better than 30,000 animals" and that "the ultimate impact on the Methow deer herd could exceed a 50 percent reduction in numbers." *Ibid.* The agency asserted that "Okanogan County residents place a great deal of importance on the area's deer herd." *Ibid.* In addition, it explained that hunters had "harvested" 3,247 deer in the Methow Valley area in 1981, and that, since in 1980 hunters on average spent $1,980 for each deer killed in Washington, they had contributed over $6 million to the State's economy in 1981. Because the deer harvest is apparently proportional to the size of the herd, the state agency predicted that "Washington business can expect to lose over $3 million annually from reduced recreational opportunity." *Ibid.* The Forest Service's own analysis of the impact on the deer herd was more modest. It first concluded that the actual operation of the ski hill would have only a "minor" direct impact on the herd,[7] but then recog-

---

[7] *Id.*, at 76. The Study predicted that development of the ski area would diminish available summer range for the deer by between 5 and 10 percent, depending on the level of development chosen. Moreover, it recognized that although disturbance would be greatest during fawning season, "[f]awning would not be adversely affected with implementation of mitigation measures." *Id.*, at 75–76.

nized that the off-site effect of the development "would no-
ticeably reduce numbers of deer in the Methow [Valley] with
any alternative." *Id.*, at 76. Although its estimate indi-
cated a possible 15 percent decrease in the size of the herd, it
summarized the State's contrary view in the text of the EIS,
and stressed that off-site effects are difficult to estimate due
to uncertainty concerning private development. *Ibid.*

As was true of its discussion of air quality, the EIS also
described both on-site and off-site mitigation measures.
Among possible on-site mitigation possibilities, the Study
recommended locating runs, ski lifts, and roads so as to mini-
mize interference with wildlife, restricting access to selected
roads during fawning season, and further examination of the
effect of the development on mule deer migration routes.[8]
Off-site options discussed in the Study included the use of
zoning and tax incentives to limit development on deer win-
ter range and migration routes, encouragement of conserva-
tion easements, and acquisition and management by local

---

[8] The EIS listed the following opportunities for on-site mitigation:

"a) Locate runs, lifts, roads, and other facilities to minimize disturbance of
blue grouse wintering areas (primarily ridgetops).

"b) Leave dead and defective trees standing in timbered areas where skier
safety can be protected.

"c) Restrict activities and travel on selected roads during the fawning sea-
son (June).

"d) Locate new service roads away from water sources and fawning cover.

"e) Evaluate impact to mule deer migration routes in review of Master
Plan.

"f) Design and harvest nearby, off-site timber sales to retain adequate
travel corridors, foraging, roosting, and nesting sites for spotted owls.

"g) Protect other likely migration routes between summer and winter hab-
itats for spotted owls.

"h) Restrict other activities within the spotted owls home range.

"i) Springs and riparian areas in the permit area will be protected as water
sources and wildlife habitat. . . ." *Id.*, at 16–17.

The Study further noted that additional mitigation opportunities might re-
sult from review of the master plan. *Id.*, at 77.

government of critical tracts of land.[9]   As with the measures suggested for mitigating the off-site effects on air quality, the proposed options were primarily directed to steps that might be taken by state and local government.

Ultimately, the Early Winters Study recommended the issuance of a permit for development at the second highest level considered—a 16-lift ski area able to accommodate 8,200 skiers at one time.   On July 5, 1984, the Regional Forester decided to issue a special use permit as recommended by the

---

[9] The Study listed the following steps that state and local government might take to mitigate off-site effects:

"[1] Limit development on deer winter range and along migration routes through rezoning options, tax incentives and other means.

"Since loss of winter range and disruption of migration routes are primarily concerns which will cause declines in deer numbers, protection of vital portions will be assured prior to a ski hill development.   Rezoning is essential and will occur, to include County rezoning options such as:

"(a) The Methow Review District which is currently applied to obtain certain densities, open space, and design.

"(b) Other optional zone districts such as Conservation Districts which are available for amending existing zoning and protecting environmentally sensitive lands.

"Other measures are probably needed, and which could occur, include:

"(c) Conservation Easements between private individuals and trust agencies (e. g., Washington Department of Game) should be encouraged. Benefits would occur to both the landowner in the form of tax breaks, and the wildlife resource in the form of undeveloped, status quo habitat.

"(d) Acquisition of certain land tracts essential to migrating deer may be needed to insure continued passage.   These lands would be administered by a wildlife management agency (e. g., Washington Department of Game).

"[2] Minimize potential road kills of deer and other wildlife by use of warning signs, speed limits, and roadway design where wildlife crossings and high speed driving occur.   Responsibility rests with the appropriate agency's road department (i. e., County, State, Federal) in the Methow Valley.

"[3] Protect wildlife from free-ranging dogs through County ordinances that are enforceable.

"[4] Through zoning, discourage development in riparian areas." *Id.*, at 77–78.

Study.[10]   App. to Pet. for Cert. 63a.   In his decision, the Regional Forester found that no major adverse effects would result directly from the federal action, but that secondary effects could include a degradation of existing air quality and a reduction of mule deer winter range.   *Id.*, at 67a.   He therefore directed the supervisor of the Okanogan National Forest, both independently and in cooperation with local officials, to identify and implement certain mitigating measures.   *Id.*, at 67a–70a.

Four organizations (respondents)[11] opposing the decision to issue a permit appealed the Regional Forester's decision to the Chief of the Forest Service.   See 36 CFR § 211.18 (1988). After a hearing, he affirmed the Regional Forester's decision.   Stressing that the decision, which simply approved the general concept of issuing a 30-year special use permit for development of Sandy Butte, did not authorize construction of a particular ski area and, in fact, did not even act on MRI's specific permit application, he concluded that the EIS' discussion of mitigation was "adequate for this stage in the review process."   App. to Pet. for Cert. 59a.

Thereafter, respondents brought this action under the Administrative Procedure Act, 5 U. S. C. §§ 701–706, to obtain judicial review of the Forest Service's decision.   Their principal claim was that the Early Winters Study did not satisfy

---

[10] His decision did not identify a particular developer, but rather simply authorized the taking of competitive bids.   App. to Pet. for Cert. 63a.   It was not until July 21, 1986, almost one month after the District Court affirmed the Forester's decision, that a special use permit was issued to MRI.

[11] The four organizations were Methow Valley Citizens Council, Washington State Sportsmen's Council, Washington Environmental Council, and the Cascade Chapter, Sierra Club.   These organizations, with the exception of Washington State Sportsmen's Council, are respondents herein. MRI, the permittee, is also a respondent in this Court, but since it supports the Government's action, we shall use the term "respondents" to refer only to the opponents of the Early Winters proposal.

the requirements of NEPÁ, 42 U. S. C. § 4332.[12]   With the consent of the parties, the case was assigned to a United States Magistrate.   See 28 U. S. C. § 636(c).   After a trial, the Magistrate filed a comprehensive written opinion and concluded that the EIS was adequate.   App. to Pet. for Cert. 20a.   Specifically, he found that the EIS had adequately disclosed the adverse impacts on the mule deer herd and on air quality and that there was no duty to prepare a "worst case analysis" because the relevant information essential to a reasoned decision was available.   *Id.*, at 39a–44a. In concluding that the discussion of off-site, or secondary, impacts was adequate, the Magistrate stressed that courts apply a "rule of reason" in evaluating the adequacy of an EIS and "take the uncertainty and speculation involved with secondary impacts into account in passing on the adequacy of the discussion of secondary impacts."   *Id.*, at 38a.   On the subject of mitigation, he explained that "[m]ere listing . . . is generally inadequate to satisfy the CEQ regulations," but found that "in this EIS there is more—not much more—but more than a mere listing of mitigation measures."   *Id.*, at 41a.   Moreover, emphasizing the tiered nature of the Forest Service's decisional process, the Magistrate noted that additional mitigation strategies would be included in the master plan, that the Forest Service continues to develop mitigation plans as further information becomes available, and that the Regional Forester's decision conditioned issuance of the special use permit on execution of an agreement between the Forest Service, the State of Washington, and Okanogan County concerning mitigation.   *Id.*, at 41a–42a, 45a.

Concluding that the Early Winters Study was inadequate as a matter of law, the Court of Appeals reversed.   *Methow Valley Citizens Council* v. *Regional Forester*, 833 F. 2d 810

---

[12] Respondents also alleged violations of the National Forest Management Act of 1976, 16 U. S. C. §§ 1600–1614, and the Clean Air Act, 42 U. S. C. §§ 7401–7626.   These claims were dismissed on petitioners' motion for summary judgment and are no longer in issue.   App. to Pet. for Cert. 22a.

(CA9 1987). The court held that the Forest Service could not rely on "'the implementation of mitigation measures'" to support its conclusion that the impact on the mule deer would be minor, "since not only has the effectiveness of these mitigation measures not yet been assessed, but the mitigation measures themselves have yet to be developed." *Id.*, at 817. It then added that if the agency had difficulty obtaining adequate information to make a reasoned assessment of the environmental impact on the herd, it had a duty to make a so-called "worst case analysis." Such an analysis is "'formulated on the basis of available information, using reasonable projections of the worst possible consequences of a proposed action.' *Save our Ecosystems*, 747 F. 2d, at 1244–45 (quoting 46 Fed. Reg. 18032 (1981))." *Ibid.*

The court found a similar defect in the EIS' treatment of air quality. Since the EIS made it clear that commercial development in the Methow Valley will result in violations of state air-quality standards unless effective mitigation measures are put in place by the local governments and the private developer, the Court of Appeals concluded that the Forest Service had an affirmative duty to "develop the necessary mitigation measures *before* the permit is granted." *Id.*, at 819 (emphasis in original) (footnote omitted). The court held that this duty was imposed by both the Forest Service's own regulations and § 102 of NEPA. *Ibid.* It read the statute as imposing a substantive requirement that "'action be taken to mitigate the adverse effects of major federal actions.'" *Ibid.* (quoting *Stop H–3 Assn.* v. *Brinegar*, 389 F. Supp. 1102, 1111 (Haw. 1974), rev'd on other grounds, 533 F. 2d 434 (CA9), cert. denied, 429 U. S. 999 (1976)). For this reason, it concluded that "an EIS must include a thorough discussion of measures to mitigate the adverse environmental impacts of a proposed action." 833 F. 2d, at 819. The Court of Appeals concluded by quoting this paragraph from an opinion it had just announced:

> "'The importance of the mitigation plan cannot be overestimated. It is a determinative factor in evaluat-

ing the adequacy of an environmental impact statement. Without a complete mitigation plan, the decisionmaker is unable to make an informed judgment as to the environmental impact of the project—one of the main purposes of an environmental impact statement.'" *Id.*, at 820 (quoting *Oregon Natural Resources Council* v. *Marsh*, 832 F. 2d 1489, 1493 (CA9 1987), rev'd, *post*, p. 360).

## II

Section 101 of NEPA declares a broad national commitment to protecting and promoting environmental quality. 83 Stat. 852, 42 U. S. C. § 4331. To ensure that this commitment is "infused into the ongoing programs and actions of the Federal Government, the act also establishes some important 'action-forcing' procedures." 115 Cong. Rec. 40416 (remarks of Sen. Jackson). See also S. Rep. No. 91–296, p. 19 (1969); *Andrus* v. *Sierra Club*, 442 U. S. 347, 350 (1979); *Kleppe* v. *Sierra Club*, 427 U. S. 390, 409, and n. 18 (1976). Section 102 thus, among other measures

"directs that, to the fullest extent possible . . . all agencies of the Federal Government shall—

.          .          .          .          .

"(C) include in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on—

"(i) the environmental impact of the proposed action,

"(ii) any adverse environmental effects which cannot be avoided should the proposal be implemented,

"(iii) alternatives to the proposed action,

"(iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and

"(v) any irreversible and irretrievable commitments of resources which would be involved in the proposed

action should it be implemented." 83 Stat. 853, 42 U. S. C. § 4332.

The statutory requirement that a federal agency contemplating a major action prepare such an environmental impact statement serves NEPA's "action-forcing" purpose in two important respects. See *Baltimore Gas & Electric Co.* v. *Natural Resources Defense Council, Inc.*, 462 U. S. 87, 97 (1983); *Weinberger* v. *Catholic Action of Hawaii/Peace Education Project*, 454 U. S. 139, 143 (1981). It ensures that the agency, in reaching its decision, will have available, and will carefully consider, detailed information concerning significant environmental impacts; it also guarantees that the relevant information will be made available to the larger audience that may also play a role in both the decisionmaking process and the implementation of that decision.

Simply by focusing the agency's attention on the environmental consequences of a proposed project, NEPA ensures that important effects will not be overlooked or underestimated only to be discovered after resources have been committed or the die otherwise cast. See *ibid.; Kleppe, supra,* at 409. Moreover, the strong precatory language of § 101 of the Act and the requirement that agencies prepare detailed impact statements inevitably bring pressure to bear on agencies "to respond to the needs of environmental quality." 115 Cong. Rec. 40425 (1969) (remarks of Sen. Muskie).

Publication of an EIS, both in draft and final form, also serves a larger informational role. It gives the public the assurance that the agency "has indeed considered environmental concerns in its decisionmaking process," *Baltimore Gas & Electric Co., supra,* at 97, and, perhaps more significantly, provides a springboard for public comment, see L. Caldwell, Science and the National Environmental Policy Act 72 (1982). Thus, in this case the final draft of the Early Winters Study reflects not only the work of the Forest Service itself, but also the critical views of the Washington State Department of Game, the Methow Valley Citizens Council, and

Friends of the Earth, as well as many others, to whom copies of the draft Study were circulated.[13] See Early Winters Study, Appendix D. Moreover, with respect to a development such as Sandy Butte, where the adverse effects on air quality and the mule deer herd are primarily attributable to predicted off-site development that will be subject to regulation by other governmental bodies, the EIS serves the function of offering those bodies adequate notice of the expected consequences and the opportunity to plan and implement corrective measures in a timely manner.

The sweeping policy goals announced in § 101 of NEPA are thus realized through a set of "action-forcing" procedures that require that agencies take a "'hard look' at environmental consequences," *Kleppe*, 427 U. S., at 410, n. 21 (citation omitted), and that provide for broad dissemination of relevant environmental information. Although these procedures are almost certain to affect the agency's substantive decision, it is now well settled that NEPA itself does not mandate particular results, but simply prescribes the necessary process. See *Strycker's Bay Neighborhood Council, Inc.* v. *Karlen*, 444 U. S. 223, 227–228 (1980) *(per curiam); Vermont Yankee Nuclear Power Corp.* v. *Natural Resources Defense Council, Inc.*, 435 U. S. 519, 558 (1978). If the adverse environmental effects of the proposed action are adequately identified and evaluated, the agency is not constrained by NEPA from deciding that other values outweigh the environmental costs. See *ibid.; Strycker's Bay Neighborhood Council, Inc., supra*, at 227–228; *Kleppe, supra*, at 410, n. 21. In this

---

[13] The CEQ regulations require that, after preparing a draft EIS, the agency request comments from other federal agencies, appropriate state and local agencies, affected Indian tribes, any relevant applicant, the public generally, and, in particular, interested or affected persons or organizations. 40 CFR § 1503.1 (1987). In preparing the final EIS, the agency must "discuss at appropriate points . . . any responsible opposing view which was not adequately discussed in the draft statement and [must] indicate the agency's response to the issue raised." § 1502.9. See also § 1503.4.

case, for example, it would not have violated NEPA if the Forest Service, after complying with the Act's procedural prerequisites, had decided that the benefits to be derived from downhill skiing at Sandy Butte justified the issuance of a special use permit, notwithstanding the loss of 15 percent, 50 percent, or even 100 percent of the mule deer herd. Other statutes may impose substantive environmental obligations on federal agencies,[14] but NEPA merely prohibits uninformed—rather than unwise—agency action.

To be sure, one important ingredient of an EIS is the discussion of steps that can be taken to mitigate adverse environmental consequences.[15] The requirement that an EIS contain a detailed discussion of possible mitigation measures flows both from the language of the Act and, more expressly, from CEQ's implementing regulations. Implicit in NEPA's demand that an agency prepare a detailed statement on "any adverse environmental effects which cannot be avoided should the proposal be implemented," 42 U. S. C.

---

[14] See, e. g., the Endangered Species Act of 1973, 87 Stat. 892, 16 U. S. C. § 1536(a)(2) (requiring that every federal agency "insure that any action authorized, funded, or carried out by such agency . . . is not likely to jeopardize the continued existence of any endangered species or threatened species"); the Department of Transportation Act of 1966, 49 U. S. C. § 303 (Secretary of Transportation may approve "use of publicly owned land of a public park, recreation area, or wildlife and waterfowl refuge . . . or land of an historic site . . . only if . . . there is no prudent and feasible alternative to using that land; and . . . the program or project includes all possible planning to minimize harm to the [area] resulting from the use").

[15] CEQ regulations define "mitigation" to include:

"(a) Avoiding the impact altogether by not taking a certain action or parts of an action.

"(b) Minimizing impacts by limiting the degree or magnitude of the action and its implementation.

"(c) Rectifying the impact by repairing, rehabilitating, or restoring the affected environment.

"(d) Reducing or eliminating the impact over time by preservation and maintenance operations during the life of the action.

"(e) Compensating for the impact by replacing or providing substitute resources or environments." 40 CFR § 1508.20 (1987).

§ 4332(C)(ii), is an understanding that the EIS will discuss the extent to which adverse effects can be avoided.   See D. Mandelker, NEPA Law and Litigation § 10:38 (1984).   More generally, omission of a reasonably complete discussion of possible mitigation measures would undermine the "action-forcing" function of NEPA.   Without such a discussion, neither the agency nor other interested groups and individuals can properly evaluate the severity of the adverse effects. An adverse effect that can be fully remedied by, for example, an inconsequential public expenditure is certainly not as serious as a similar effect that can only be modestly ameliorated through the commitment of vast public and private resources.   Recognizing the importance of such a discussion in guaranteeing that the agency has taken a "hard look" at the environmental consequences of proposed federal action, CEQ regulations require that the agency discuss possible mitigation measures in defining the scope of the EIS, 40 CFR § 1508.25(b) (1987), in discussing alternatives to the proposed action, § 1502.14(f), and consequences of that action, § 1502.16(h), and in explaining its ultimate decision, § 1505.2(c).

There is a fundamental distinction, however, between a requirement that mitigation be discussed in sufficient detail to ensure that environmental consequences have been fairly evaluated, on the one hand, and a substantive requirement that a complete mitigation plan be actually formulated and adopted, on the other.   In this case, the off-site effects on air quality and on the mule deer herd cannot be mitigated unless nonfederal government agencies take appropriate action. Since it is those state and local governmental bodies that have jurisdiction over the area in which the adverse effects need be addressed and since they have the authority to mitigate them, it would be incongruous to conclude that the Forest Service has no power to act until the local agencies have reached a final conclusion on what mitigating measures

they consider necessary.[16] Even more significantly, it would be inconsistent with NEPA's reliance on procedural mechanisms — as opposed to substantive, result-based standards — to demand the presence of a fully developed plan that will mitigate environmental harm before an agency can act. Cf. *Baltimore Gas & Electric Co.*, 462 U. S., at 100 ("NEPA does not require agencies to adopt any particular internal decisionmaking structure").

We thus conclude that the Court of Appeals erred, first, in assuming that "NEPA requires that 'action be taken to mitigate the adverse effects of major federal actions,'" 833 F. 2d, at 819 (quoting *Stop H–3 Assn.* v. *Brinegar*, 389 F. Supp., at 1111), and, second, in finding that this substantive requirement entails the further duty to include in every EIS "a detailed explanation of specific measures which *will* be employed to mitigate the adverse impacts of a proposed action," 833 F. 2d, at 819 (emphasis supplied).

---

[16] After the Early Winters Study was completed and distributed, the Forest Service, the Environmental Protection Agency, the State Department of Ecology, and Okanogan County entered into a memorandum of understanding (MOU) committing various parties to take certain actions in mitigation. App. to Pet. for Cert. 45a–46a. In concluding that this agreement did not satisfy the mitigation discussion requirement, the Court of Appeals wrote:

"[T]he MOU offers no assurance whatsoever that the vague mitigation objectives it features — performance of almost all of which would be the responsibility of third parties to the permit process — would ever in fact be achieved or even that effective measures would ever be designed (let alone implemented), if the Early Winters development were to proceed. Cf. *Preservation Coalition* [v. *Pierce*, 667 F. 2d 851, 860 (CA9 1982)] ('Since many of the "mitigations" proposed by the agency were . . . potential actions to be taken by [third parties] reliance on them . . . was improper')." *Methow Valley Citizens Council* v. *Regional Forester*, 833 F. 2d 810, 819–820 (CA9 1987).

Because NEPA imposes no substantive requirement that mitigation measures actually be taken, it should not be read to require agencies to obtain an assurance that third parties will implement particular measures.

## III

The Court of Appeals also concluded that the Forest Service had an obligation to make a "worst case analysis" if it could not make a reasoned assessment of the impact of the Early Winters project on the mule deer herd. Such a "worst case analysis" was required at one time by CEQ regulations, but those regulations have since been amended. Moreover, although the prior regulations may well have expressed a permissible application of NEPA, the Act itself does not mandate that uncertainty in predicting environmental harms be addressed exclusively in this manner. Accordingly, we conclude that the Court of Appeals also erred in requiring the "worst case" study.

In 1977, President Carter directed that CEQ promulgate binding regulations implementing the procedural provisions of NEPA. Exec. Order No. 11991, 3 CFR 123 (1977 Comp.). Pursuant to this Presidential order, CEQ promulgated implementing regulations. Under § 1502.22 of these regulations — a provision which became known as the "worst case requirement" — CEQ provided that if certain information relevant to the agency's evaluation of the proposed action is either unavailable or too costly to obtain, the agency must include in the EIS a "worst case analysis and an indication of the probability or improbability of its occurrence." 40 CFR § 1502.22 (1985). In 1986, however, CEQ replaced the "worst case" requirement with a requirement that federal agencies, in the face of unavailable information concerning a reasonably foreseeable significant environmental consequence, prepare "a summary of existing credible scientific evidence which is relevant to evaluating the . . . adverse impacts" and prepare an "evaluation of such impacts based upon theoretical approaches or research methods generally accepted in the scientific community." 40 CFR § 1502.22(b) (1987). The amended regulation thus "retains the duty to describe the consequences of a remote, but potentially severe impact, but grounds the duty in evaluation of scientific opinion rather

than in the framework of a conjectural 'worst case analysis.'" 50 Fed. Reg. 32237 (1985).

The Court of Appeals recognized that the "worst case analysis" regulation has been superseded, yet held that "[t]his rescission . . . does not nullify the requirement . . . since the regulation was merely a codification of prior NEPA case law." 833 F. 2d, at 817, n. 11. This conclusion, however, is erroneous in a number of respects. Most notably, review of NEPA case law reveals that the regulation, in fact, was not a codification of prior judicial decisions. See Note, 86 Mich. L. Rev. 777, 798, 800–802, 813–814 (1988). The cases cited by the Court of Appeals ultimately rely on the Fifth Circuit's decision in *Sierra Club* v. *Sigler*, 695 F. 2d 957 (1983). *Sigler*, however, simply recognized that the "worst case analysis" regulation codified the "judicially created principl[e]" that an EIS must "consider the probabilities of the occurrence of any environmental effects it discusses." *Id.*, at 970–971. As CEQ recognized at the time it superseded the regulation, case law prior to the adoption of the "worst case analysis" provision did require agencies to describe environmental impacts even in the face of substantial uncertainty, but did not require that this obligation necessarily be met through the mechanism of a "worst case analysis." See 51 Fed. Reg. 15625 (1986). CEQ's abandonment of the "worst case analysis" provision, therefore, is not inconsistent with any previously established judicial interpretation of the statute.

Nor are we convinced that the new CEQ regulation is not controlling simply because it was preceded by a rule that was in some respects more demanding. In *Andrus* v. *Sierra Club*, 442 U. S., at 358, we held that CEQ regulations are entitled to substantial deference. In that case we recognized that although less deference may be in order in some cases in which the "'administrative guidelines'" conflict "'with earlier pronouncements of the agency,'" *ibid.* (quoting *General Electric Co.* v. *Gilbert*, 429 U. S. 125, 143 (1976)), substantial deference is nonetheless appropriate if there appears to have

been good reason for the change, 442 U. S., at 358. Here, the amendment only came after the prior regulation had been subjected to considerable criticism.[17] Moreover, the amendment was designed to better serve the twin functions of an EIS—requiring agencies to take a "hard look" at the consequences of the proposed action and providing important information to other groups and individuals. CEQ explained that by requiring that an EIS focus on reasonably foreseeable impacts, the new regulation "will generate information and discussion on those consequences of greatest concern to the public and of greatest relevance to the agency's decision," 50 Fed. Reg. 32237 (1985), rather than distorting the decisionmaking process by overemphasizing highly speculative harms, 51 Fed. Reg. 15624–15625 (1986); 50 Fed. Reg. 32236 (1985). In light of this well-considered basis for the change, the new regulation is entitled to substantial deference. Accordingly, the Court of Appeals erred in concluding that the Early Winters Study is inadequate because it failed to include a "worst case analysis."[18]

---

[17] As CEQ explained:

"Many respondents to the Council's Advance Notice of Proposed Rulemaking pointed to the limitless nature of the inquiry established by this requirement; that is, one can always conjure up a worse 'worst case' by adding an additional variable to a hypothetical scenario. Experts in the field of risk analysis and perception stated that the 'worst case analysis' lacks defensible rationale or procedures, and that the current regulatory language stands 'without any discernible link to the disciplines that have devoted so much thought and effort toward developing rational ways to cope with problems of uncertainty. It is, therefore, not surprising that no one knows how to do a worst case analysis . . .', Slovic, P., February 1, 1985, Response to ANPRM.

"Moreover, in the institutional context of litigation over EIS(s) the 'worst case' rule has proved counterproductive, because it has led to agencies being required to devote substantial time and resources to preparation of analyses which are not considered useful to decisionmakers and divert the EIS process from its intended purpose." 50 Fed. Reg. 32236 (1985).

[18] Amicus curiae Center for Environmental Education argues that the Court of Appeals properly applied the "worst case analysis" provision because the new regulation only applies to "environmental impact statements

## IV

The Court of Appeals also held that the Forest Service's failure to develop a complete mitigation plan violated the agency's own regulations. 833 F. 2d, at 814, n. 3, 819, and n. 14. Those regulations require that an application for a special use permit include "measures and plans for the protection and rehabilitation of the environment during construction, operation, maintenance, and termination of the project," 36 CFR § 251.54(e)(4) (1988), and that "[e]ach special use authorization . . . contain . . . [t]erms and conditions which will . . . minimize damage to scenic and esthetic values and fish and wildlife habitat and otherwise protect the environment," § 251.56(a)(1)(ii). Applying those regulations, the Court of Appeals concluded that "[s]ince the mitigation 'plan' here at issue is so vague and undeveloped as to be wholly inadequate, . . . the Regional Forester's decision to grant the special use permit could be none other than arbitrary, capricious and an abuse of discretion." 833 F. 2d, at 814, n. 3. We disagree.

The Early Winters Study made clear that on-site effects of the development will be minimal and will be easily mitigated. For example, the Study reported that "[i]mpacts from construction, maintenance and operation of the proposed 'hill' development on National Forest land will not have a measurable effect on existing or future air quality," Early Winters Study 65, and that "[t]he effect development and operation of the ski hill would have on deer migration should be minor," *id.*, at 76. Given the limited on-site effects of the proposed

---

for which a Notice of Intent (40 CFR § 1508.22) [was] published . . . on or after May 27, 1986." 40 CFR § 1502.22(c) (1987). The grandfather clause of the regulation, however, further specifies that agencies have the option of applying the old or new regulation to EIS's commenced prior to May 27, 1986, that are still "in progress" after that date. *Ibid.* Because the Court of Appeals ordered that the Forest Service revise the Early Winters Study, and because such a revision is necessary even though we hold today that the Court of Appeals erred in part, the Study remains "in progress" and thus the Forest Service is entitled to rely on the new regulation.

development, the recommended ameliorative steps — which, for example, called for "prompt revegetation of all disturbed areas," *id.*, at 69, and suggested locating "new service roads away from water resources and fawning cover," *id.*, at 16 — cannot be deemed overly vague or underdeveloped.

The Court of Appeals' conclusion that the Early Winters Study's treatment of possible mitigation measures is inadequate apparently turns on the court's review of the proposed off-site measures. Although NEPA and CEQ regulations require detailed analysis of both on-site and off-site mitigation measures, see, *e. g.*, 40 CFR § 1502.16(b) (1987), there is no basis for concluding that the Forest Service's own regulations must also be read in all cases to condition issuance of a special use permit on consideration (and implementation) of off-site mitigation measures. The Forest Service regulations were promulgated pursuant to a broad grant of authority "to permit the use and occupancy of suitable areas of land within the national forests . . . for the purpose of constructing or maintaining hotels, resorts, and any other structures or facilities necessary or desirable for recreation, public convenience, or safety," 16 U. S. C. § 497, and were not based on the more direct congressional concern for environmental quality embodied in NEPA.[19] See H. R. Rep. No. 99–709, pt. 1, p. 2 (1986). As is clear from the text of the permit issued to MRI, the Forest Service has decided to implement its mitigation regulations by imposing appropriate controls over MRI's actual development and operation during the term of the permit.[20] It was surely not unreasonable for the Forest

---

[19] In October 1986, after the Forest Service issued its special use permit to MRI, Congress substantially revised the process for authorizing use of lands within the National Forest system for Nordic and Alpine ski operations. See National Forest Ski Area Permit Act of 1986, 100 Stat. 3000, 16 U. S. C. § 497b (1982 ed., Supp. V). These new procedures are not in issue in this case.

[20] The special use permit provides, in part, that the permittee "shall submit plans to reasonably restore or protect all areas disturbed during con-

Service in this case to have construed those regulations as not extending to actions that might be taken by Okanogan County or the State of Washington to ameliorate the off-site effects of the Early Winters project on air quality and the mule deer herd. This interpretation of the agency's own regulation is not "plainly erroneous or inconsistent with the regulation," and is thus controlling. *Bowles* v. *Seminole Rock & Sand Co.*, 325 U. S. 410, 414 (1945). See also *Lyng* v. *Payne*, 476 U. S. 926, 939 (1986); *Udall* v. *Tallman*, 380 U. S. 1, 16–17 (1965).

## V

In sum, we conclude that NEPA does not require a fully developed plan detailing what steps *will* be taken to mitigate adverse environmental impacts and does not require a "worst case analysis." In addition, we hold that the Forest Service has adopted a permissible interpretation of its own regulations. The judgment of the Court of Appeals is accordingly reversed, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

JUSTICE BRENNAN, concurring.

I write separately to highlight the Court's observation that "one important ingredient of an EIS is the discussion of steps that can be taken to mitigate adverse environmental consequences." *Ante*, at 351.

---

struction," and that "[e]ach stage of construction will be considered complete only upon completion and acceptance of the successful seeding and planting in the vicinity of construction," Special Use Authorization 17 (July 21, 1986); that the permittee shall prevent soil erosion "by carrying out the provisions of the erosion control plan prepared by the holder and approved by the authorized officer," *id.*, at 19; that "[p]esticides may not be used to control undesirable woody and herbaceous vegetation, aquatic plants, insects, rodents, etc., without the prior written approval of the Forest Service," *ibid.;* and that "[o]pen fireplaces shall be equipped with spark screens," *id.*, at 20.