BRANHAVEN PLAZA, LLC, ET AL. *v.* INLAND
WETLANDS COMMISSION OF THE
TOWN OF BRANFORD ET AL.
(SC 16141)

McDonald, C. J., and Borden, Berdon, Norcott, Katz, Palmer and Callahan, Js.

Argued September 29—officially released November 30, 1999

*John B. Farley*, with whom were *David B. Losee* and, on the brief, *Kathleen A. St. Onge*, for the appellants (plaintiffs).

*David H. Wrinn*, assistant attorney general, with whom, on the brief, was *Richard Blumenthal*, attorney general, for the appellee (defendant commissioner of environmental protection).

*Brian R. Smith*, with whom were *Kenneth C. Baldwin* and *Robert J. Sitkowski*, for the appellee (defendant Stop and Shop Supermarket Company).

*Opinion*

MCDONALD, C. J. In this certified appeal, the plaintiffs, Branhaven Plaza, LLC, and The Great Atlantic and Pacific Tea Company, Inc./Waldbaum's, Inc., appeal from the judgment of the trial court following the granting of an application by the named defendant, the inland wetlands commission of the town of Branford (commission), for an inland wetlands permit to the defendant Stop and Shop Supermarket Company (Stop & Shop).[1] The plaintiffs claim that the trial court, *Downey, J.*, improperly dismissed the appeal, thereby upholding the commission's decision to approve Stop & Shop's application to conduct regulated activities associated with the construction of a supermarket. We reverse the judgment of the trial court.

The relevant facts are primarily undisputed.[2] Stop & Shop filed an application with the commission for a permit to conduct regulated activities on property located at 1151, 1201 and 1219 West Main Street in the town of Branford, in connection with the proposed construction of a supermarket. The property in question consists of approximately 10.7 acres, and is located in the southwest part of Branford. There are three wetlands and one watercourse on the property. The first wetland, located in a topographical depression among mounds of fill and exposed bedrock, covers approximately 0.21 acres and is located in the central portion of the property. The second wetland, located south of the first wetland and separated from it by discarded

---

[1] The commissioner of environmental protection is also a defendant in this case.

[2] Although the precise dimensions of the first and second wetlands on the site are disputed, the disparity is negligible.

asphalt piles, covers approximately 0.026 acres. The third wetland, described as a wet meadow community, with shrubs and trees primarily located around its edge, is approximately 0.5 acres in size and is located in the southeastern section of the site. The watercourse is located in the southwestern portion of the site. It comprises some 0.11 acres and consists of a sparsely vegetated channel entering the property from the west and proceeding through the site in a southeasterly direction. Stop & Shop's initial proposal called for eliminating the first and second wetlands and enhancing the area near the third wetland, which included creating a new wetland adjacent to the existing third wetland. In light of the proposed construction plan, the commission made a finding of "significant activity," as defined in § 2.1cc of the Branford inland wetlands and watercourses regulations,[3] on land containing certain areas regulated as

---

[3] Section 2.1cc of the Branford inland wetlands and watercourses regulations provides: " 'Significant activity' means any activity including, but not limited to, the following activities which may have a substantial effect on the area for which an application has been filed, or on another part of the wetland or watercourse system;

"1. Any activity involving a deposition or removal of material which may or will have a substantial effect on the area or on another part of the inland wetland or watercourse system, or

"2. Any activity which substantially changes the natural channel or may inhibit the natural dynamics of a watercourse system, or

"3. Any activity which substantially diminishes the natural capacity of an inland wetland or watercourse to support fisheries, wildlife, or other biological life, prevent flooding, supply water, assimilate waste, facilitate drainage, provide recreation or open space or other functions, or

"4. Any activity which causes substantial turbidity, siltation or sedimentation in a wetland or watercourse, or

"5. Any activity which causes a substantial diminution of flow of a natural watercourse, or groundwater levels of the regulated area, or

"6. Any activity which causes or has the potential to cause pollution of a wetland or watercourse, or

"7. Any activity which creates conditions of an inland wetland or watercourse which may adversely affect the health, welfare, and safety of any individual or the community, or

"8. Any activity which destroys unique wetland or watercourse areas having demonstrable scientific, educational or ecological value."

"wetlands" or "watercourses" as defined in General Statutes § 22a-38 (15) and (16).[4] As a result of this finding, the commission scheduled public hearings on Stop & Shop's application pursuant to § 9.1 of Branford's inland wetlands and watercourses regulations. The plaintiffs intervened in the matter pursuant to General Statutes § 22a-19 (a),[5] and participated in the administrative proceedings.

During the proceedings, Stop & Shop modified its initial proposal and, rather than create a new wetland, proposed the construction of a detention or infiltration basin on the property. This change was made in response to concerns about on-site flood control. Subsequently, the commission members raised doubts about the sufficiency of the proposal and its effect on the watershed. Stop & Shop responded to the commission's concern by proposing the payment of money and in-kind services for future off-site mitigation. The

[4] General Statutes § 22a-38 provides in relevant part: "As used in sections 22a-36 to 22a-45a, inclusive . . .

"(15) 'Wetlands' means land, including submerged land, not regulated pursuant to sections 22a-28 to 22a-35, inclusive, which consists of any of the soil types designated as poorly drained, very poorly drained, alluvial, and floodplain by the National Cooperative Soils Survey, as may be amended from time to time, of the Natural Resources Conservation Service of the United States Department of Agriculture;

"(16) 'Watercourses' means rivers, streams, brooks, waterways, lakes, ponds, marshes, swamps, bogs and all other bodies of water, natural or artificial, vernal or intermittent, public or private, which are contained within, flow through or border upon this state or any portion thereof, not regulated pursuant to sections 22a-28 to 22a-35, inclusive. . . ."

[5] General Statutes § 22a-19 (a) provides: "In any administrative, licensing or other proceeding, and in any judicial review thereof made available by law, the Attorney General, any political subdivision of the state, any instrumentality or agency of the state or of a political subdivision thereof, any person, partnership, corporation, association, organization or other legal entity may intervene as a party on the filing of a verified pleading asserting that the proceeding or action for judicial review involves conduct which has, or which is reasonably likely to have, the effect of unreasonably polluting, impairing or destroying the public trust in the air, water or other natural resources of the state."

commission then accepted and integrated that proposal into the approval of the permit. On March 13, 1997, the commission approved Stop & Shop's application subject to nine conditions.[6] Condition six provided that the " '[b]anking mitigation' offered by the applicant [is] to be accepted by the commission for future mitigation, restoration, improvement, and or study in the same watershed. This amount [is] to be not less than $25,000 plus a like amount of in kind professional/engineering services to be provided for the abovementioned purposes during the next four to five years. This funding

---

[6] In an approval letter dated March 14, 1997, the commission approved the application subject to the following conditions: "1. [T]he [first] half inch of water from rainfall events [is] to be retained without discharge over the entire site . . . [and 80 percent of the annual total suspended solids are to be removed]. 2. The Stormwater Management Plan . . . should be amended to include periodic maintenance and rubbish removal for all wetland areas. 3. [The] maintenance and scheduling of maintenance for all grounds, parking areas, stormwater systems and wetlands should be clearly posted for the public to see in the front alcove of the building. This posting [should] include the names of the individuals or contractors responsible for said duties along with their signatures on the specified dates of action. 4. The treatment of the rip rap . . . along the watercourse . . . should be improved to include the planting of appropriate species to colonize and stabilize the slopes of this watercourse. . . . 5. The applicant [is] to be responsible for the stability of the banks . . . of the portion of the stream. . . . 6. [The applicant shall provide banking mitigation] to be accepted by the commission for future mitigation, restoration, improvement, and or study in the same watershed. This amount [is] to be not less than $25,000 plus a like amount of in kind professional/engineering services to be provided for the abovementioned purposes during the next four to five years. This funding and gift of services is to be used at the discretion of the Inland Wetlands Commission only. 7. [On-site work is not to commence] before bonding in the amount of $29,400, in the form of a cash bond, certificate of deposit or insurance surety bond, is secured and delivered in proper form to the Town of Branford. 8. All supporting plans and practices submitted by the applicant in support of this application are to be strictly adhered to. Where there is a conflict in the plans and practices presented, the plans are to be interpreted in a manner most favorable, or pleasing to, to the Inland Wetland Commission. 9. The Town Engineer of Branford, Ct. must review, verify and agree with the engineering data submitted by the applicant's engineer, regarding no net increase in peak flow for 25, 50 and 100 year storm events."

and gift of services is to be used at the discretion of the Inland Wetlands Commission only."

The plaintiffs appealed from the commission's decision to the trial court, claiming aggrievement pursuant to § 22a-19. See footnote 5 of this opinion. Stop & Shop filed a motion to dismiss the appeal, arguing that the plaintiffs had failed to intervene properly. The trial court denied the motion to dismiss and heard argument on the merits of the plaintiffs' appeal. The plaintiffs claimed that the commission's decision was not supported by the record, and that the commission had abused its discretion by, inter alia, failing or refusing to follow its own regulations and the mandates of the General Statutes. The trial court rendered judgment dismissing the appeal, thereby upholding the commission's decision to approve the application.

The plaintiffs petitioned the Appellate Court for certification pursuant to General Statutes §§ 22a-43 (a)[7] and

---

[7] General Statutes § 22a-43 (a) provides: "The commissioner or any person aggrieved by any regulation, order, decision or action made pursuant to sections 22a-36 to 22a-45, inclusive, by the commissioner, district or municipality or any person owning or occupying land which abuts any portion of land or is within a radius of ninety feet of the wetland or watercourse involved in any regulation, order, decision or action made pursuant to said sections may, within the time specified in subsection (b) of section 8-8 from the publication of such regulation, order, decision or action, appeal to the superior court for the judicial district where the land affected is located, and if located in more than one judicial district to the court in any such judicial district. Such appeal shall be made returnable to said court in the same manner as that prescribed for civil actions brought to said court, except that the record shall be transmitted to the court within the time specified in subsection (i) of section 8-8. Notice of such appeal shall be served upon the inland wetlands agency and the commissioner. The commissioner may appear as a party to any action brought by any other person within thirty days from the date such appeal is returned to the court. The appeal shall state the reasons upon which it is predicated and shall not stay proceedings on the regulation, order, decision or action, but the court may on application and after notice grant a restraining order. Such appeal shall have precedence in the order of trial."

8-8.[8] The Appellate Court granted the petition. While the appeal was pending in the Appellate Court, Stop & Shop moved to dismiss, claiming that the plaintiffs lacked standing to appeal in their capacity as intervenors. The Appellate Court denied that motion on January 27, 1999. This court then transferred the appeal to itself and issued a stay of execution. Thereafter, Stop & Shop moved this court to dismiss the appeal for lack of standing and also moved to terminate the stay. This court postponed decision on these motions until the resolution of the plaintiffs' claims on the merits discussed herein.[9]

In this appeal, the plaintiffs contend that: (1) the trial court improperly concluded that the commission could accept the payment of money and in-kind services as mitigation for the impact of the proposed activity on the wetland; (2) the receipt of storm water drainage calculations from Stop & Shop after the closing of the public hearing violated the plaintiffs' due process rights and was an improper delegation of the commission's duties; (3) the trial court improperly found that Stop &

---

[8] General Statutes § 8-8 (b) provides: "Except as provided in subsections (c) and (d) of this section and sections 7-147 and 7-147i, any person aggrieved by any decision of a board may take an appeal to the superior court for the judicial district in which the municipality is located. The appeal shall be commenced by service of process in accordance with subsections (e) and (f) of this section within fifteen days from the date that notice of the decision was published as required by the general statutes. The appeal shall be returned to court in the same manner and within the same period of time as prescribed for civil actions brought to that court."

[9] The motion to dismiss is denied. Section 22a-19 (a) allows any person to intervene so that private citizens are provided a voice in ensuring that the natural resources of the state remain protected. Because the plaintiffs filed a notice of intervention at the commission hearings in accordance with § 22a-19 (a), they had standing to appeal the environmental issues associated with that commission's decision. See *Red Hill Coalition, Inc.* v. *Conservation Commission*, 212 Conn. 710, 715, 563 A.2d 1339 (1989). Moreover, in light of our holding with respect to the first claim, the motion to terminate the stay is moot.

Shop's failure to introduce affirmative evidence to support its claim of no feasible and prudent alternatives was excused where the commission was aware of the issue and its finding of no feasible and prudent alternatives was merely implicit in its decision; and (4) the trial court improperly found that substantial evidence existed to support the commission's finding that soil conditions were suitable for construction of a proposed infiltration basin. We agree with the plaintiffs' first claim. In light of our holding with respect to the first claim, it is not necessary to address the plaintiffs' remaining claims.

With regard to the first claim, the plaintiffs contend that the payment of money as mitigation for the destruction of wetlands is contrary to the legislature's intent and the purpose of the Inland Wetlands and Watercourses Act (act). General Statutes §§ 22a-36 through 22a-45. Moreover, the plaintiffs maintain that this court's holding in *Red Hill Coalition, Inc.* v. *Conservation Commission*, 212 Conn. 710, 722–23, 563 A.2d 1339 (1989), that off-site mitigation, under the circumstances of that case, was permitted under the act, is distinguishable from the facts of the present case. Stop & Shop argues, to the contrary, that the trial court properly affirmed the commissioner's approval of its application. According to Stop & Shop, the facts of the present case are controlled by this court's holding in *Red Hill Coalition, Inc.* v. *Conservation Commission*, supra, 722–23. We agree with the plaintiffs.

Whether the trial court improperly concluded that the commission could accept the payment of money and in-kind services as mitigation is a matter of statutory interpretation. "Generally, [o]ur review of an agency's decision on questions of law is limited by the traditional deference that we have accorded to that agency's interpretation of the acts it is charged with enforcing. . . . We do not, however, accord special deference to the

agency's decision when that decision involves a question of law [that] has not previously been subject to judicial scrutiny." (Citation omitted; internal quotation marks omitted.) *Church Homes, Inc.* v. *Administrator, Unemployment Compensation Act*, 250 Conn. 297, 303, 735 A.2d 805 (1999). Therefore, our review is plenary.

"The process of statutory interpretation involves a reasoned search for the intention of the legislature. . . . In other words, we seek to determine, in a reasoned manner, the meaning of the statutory language as applied to the facts of this case . . . . In seeking to determine that meaning, we look to the words of the statute itself, to the legislative history and circumstances surrounding its enactment, to the legislative policy it was designed to implement, and to its relationship to existing legislation and common law principles governing the same general subject matter." (Citation omitted; internal quotation marks omitted.) *Luce* v. *United Technologies Corp.*, 247 Conn. 126, 133, 717 A.2d 747 (1998).

The regulation of inland wetlands and watercourses is governed by the act. General Statutes §§ 22a-36 through 22a-45. The statement of purpose of the act, set forth in § 22a-36,[10] indicates that "[t]he inland wetlands and watercourses of the state of Connecticut are

___

[10] General Statutes § 22a-36 provides: "The inland wetlands and watercourses of the state of Connecticut are an indispensable and irreplaceable but fragile natural resource with which the citizens of the state have been endowed. The wetlands and watercourses are an interrelated web of nature essential to an adequate supply of surface and underground water; to hydrological stability and control of flooding and erosion; to the recharging and purification of groundwater; and to the existence of many forms of animal, aquatic and plant life. Many inland wetlands and watercourses have been destroyed or are in danger of destruction because of unregulated use by reason of the deposition, filling or removal of material, the diversion or obstruction of water flow, the erection of structures and other uses, all of which have despoiled, polluted and eliminated wetlands and watercourses. Such unregulated activity has had, and will continue to have, a significant, adverse impact on the environment and ecology of the state of Connecticut and has and will continue to imperil the quality of the environment thus

an indispensable and irreplaceable but fragile natural resource with which the citizens of the state have been endowed. . . . The preservation and protection of the wetlands and watercourses from random, unnecessary, undesirable and unregulated uses, disturbance or destruction is in the public interest and is essential to the health, welfare and safety of the citizens of the state. . . ." General Statutes § 22a-42 (a)[11] delegates these objectives to municipalities, empowering them to effectuate the purposes of the act, and § 22a-42 (c)[12]

adversely affecting the ecological, scenic, historic and recreational values and benefits of the state for its citizens now and forever more. The preservation and protection of the wetlands and watercourses from random, unnecessary, undesirable and unregulated uses, disturbance or destruction is in the public interest and is essential to the health, welfare and safety of the citizens of the state. It is, therefore, the purpose of sections 22a-36 to 22a-45, inclusive, to protect the citizens of the state by making provisions for the protection, preservation, maintenance and use of the inland wetlands and watercourses by minimizing their disturbance and pollution; maintaining and improving water quality in accordance with the highest standards set by federal, state or local authority; preventing damage from erosion, turbidity or siltation; preventing loss of fish and other beneficial aquatic organisms, wildlife and vegetation and the destruction of the natural habitats thereof; deterring and inhibiting the danger of flood and pollution; protecting the quality of wetlands and watercourses for their conservation, economic, aesthetic, recreational and other public and private uses and values; and protecting the state's potable fresh water supplies from the dangers of drought, overdraft, pollution, misuse and mismanagement by providing an orderly process to balance the need for the economic growth of the state and the use of its land with the need to protect its environment and ecology in order to forever guarantee to the people of the state, the safety of such natural resources for their benefit and enjoyment and for the benefit and enjoyment of generations yet unborn."

[11] General Statutes § 22a-42 (a) provides: "To carry out and effectuate the purposes and policies of sections 22a-36 to 22a-45a, inclusive, it is hereby declared to be the public policy of the state to require municipal regulation of activities affecting the wetlands and watercourses within the territorial limits of the various municipalities or districts."

[12] General Statutes § 22a-42 (c) provides: "On or before July 1, 1988, each municipality shall establish an inland wetlands agency or authorize an existing board or commission to carry out the provisions of sections 22a-36 to 22a-45, inclusive. Each municipality, acting through its legislative body, may authorize any board or commission, as may be by law authorized to act, or may establish a new board or commission to promulgate such

directs the municipalities to establish a commission and promulgate regulations governing the wetlands and watercourses in their respective communities.

Notwithstanding this broad delegation of power to the municipalities for the regulation of the state's wetlands and watercourses, the legislature has limited the scope of a municipality's conduct and its ability to enact regulations. Section 22a-42 (f) provides in relevant part that "[a]ny ordinances or regulations shall be for the purpose of effectuating the purposes of sections 22a-36 to 22a-45, inclusive, and, a municipality or district, in acting upon ordinances and regulations shall incorporate the factors set forth in section 22a-41 (a)."[13]

regulations, in conformity with the regulations adopted by the commissioner pursuant to section 22a-39, as are necessary to protect the wetlands and watercourses within its territorial limits. The ordinance establishing the new board or commission shall determine the number of members and alternate members, the length of their terms, the method of selection and removal and the manner for filling vacancies in the new board or commission. No member or alternate member of such board or commission shall participate in the hearing or decision of such board or commission of which he is a member upon any matter in which he is directly or indirectly interested in a personal or financial sense. In the event of such disqualification, such fact shall be entered on the records of such board or commission and replacement shall be made from alternate members of an alternate to act as a member of such commission in the hearing and determination of the particular matter or matters in which the disqualification arose. For the purposes of this section, the board or commission authorized by the municipality or district, as the case may be, shall serve as the sole agent for the licensing of regulated activities."

[13] General Statutes § 22a-41 (a) provides: "In carrying out the purposes and policies of sections 22a-36 to 22a-45a, inclusive, including matters relating to regulating, licensing and enforcing of the provisions thereof, the commissioner shall take into consideration all relevant facts and circumstances, including but not limited to:

"(1) The environmental impact of the proposed regulated activity on wetlands or watercourses;

"(2) The applicant's purpose for, and any feasible and prudent alternatives to, the proposed regulated activity which alternatives would cause less or no environmental impact to wetlands or watercourses;

"(3) The relationship between the short-term and long-term impacts of the proposed regulated activity on wetlands or watercourses and the maintenance and enhancement of long-term productivity of such wetlands or watercourses;

General Statutes § 22a-41 (a) lists the relevant facts and circumstances that must be considered in passing on a permit application after determining that a proposed activity would impact wetlands. In particular, § 22a-41 (a) (4) provides a hierarchy of considerations for reviewing issues of mitigation: "measures to (A) prevent or minimize pollution or other environmental damage, (B) maintain or enhance existing environmental quality, or (C) in the following order of priority: Restore, enhance and create productive wetland or watercourse resources." The legislature, in 1996, amended the act to include this hierarchy. Public Acts 1996, No. 96-157, § 2; see Public Acts 1996, No. 96-269. Creation of this hierarchy was designed to foster varying types of mitigation. "[T]he idea that one might actually create wetlands elsewhere as a compensatory kind of thing, or repair [a] damaged wetland either on site or elsewhere was something that we had not really embraced in the statutes before but certainly is being done to some limited extent by some commissions." 39 H.R. Proc., Pt. 14, 1996 Sess., p. 4719, remarks of Representative Jessie G. Stratton. "[T]here is a hierarchy of considerations by an inland wetlands commission on mitigation measures, from the first effort which

"(4) Irreversible and irretrievable loss of wetland or watercourse resources which would be caused by the proposed regulated activity, including the extent to which such activity would foreclose a future ability to protect, enhance or restore such resources, and any mitigation measures which may be considered as a condition of issuing a permit for such activity including, but not limited to, measures to (A) prevent or minimize pollution or other environmental damage, (B) maintain or enhance existing environmental quality, or (C) in the following order of priority: Restore, enhance and create productive wetland or watercourse resources;

"(5) The character and degree of injury to, or interference with, safety, health or the reasonable use of property which is caused or threatened by the proposed regulated activity; and

"(6) Impacts of the proposed regulated activity on wetlands or watercourses outside the area for which the activity is proposed and future activities associated with, or reasonably related to, the proposed regulated activity which are made inevitable by the proposed regulated activity and which may have an impact on wetlands or watercourses."

would be to prevent or avoid any kind of impact onto a wetland . . . [to] the rest of the hierarchy which is to restore, enhance, and create, protective, productive wetlands and water course resources." 39 S. Proc., Pt. 9, 1996 Sess., pp. 2987–88, remarks of Senator Catherine W. Cook. In light of the hierarchical approach taken by the legislature, we conclude that the creation of wetlands is preferentially lower than all other types of mitigating measures, perhaps, in part, because of the uncertainty associated with the creation and restoration of wetlands. "Mitigation of wetlands, particularly creation and restoration, is an emerging science that has yet to show promising results. No one is really certain if we can truly 'create' a wetland and successfully replace the values and functions of a natural wetland that we have destroyed." Conn. Joint Standing Committee Hearings, Environment, Pt. 3, 1996 Sess., p. 654, memorandum from Lisa Santacroce, director of environmental affairs at the Connecticut Audubon Society.

In *Red Hill Coalition, Inc.* v. *Conservation Commission,* supra, 212 Conn. 710, this court examined the boundaries of permissible wetland mitigation under the act, addressing the issue of "off-site" mitigation. In particular, we addressed the issue of off-site creation and restoration of wetlands as mitigation. In deciding that the off-site mitigation, under the facts of the case, was reasonable in accordance with the act, this court held that the trial court acted within permissible limits. Id., 722–23. In *Red Hill Coalition, Inc.,* the commission had approved the application and issued the permit subject to a condition that, in exchange for the right to eliminate the wetland, the applicant would "provide reasonable compensation for wetland development or enhancement to be determined in the future . . . working directly with the applicant and other interested parties in [the] [t]own to identify, define and seek proper

approvals of said compensating activity." (Internal quotation marks omitted.) Id., 714.

We premised our decision on the fact that "[i]t is obvious from the record that the commission originally intended, as compensation for the pond to be filled, to have the applicants excavate a pond at [an off-site location] on Holland Brook in Earle Park, a public park in Glastonbury . . . ." Id., 717–18. Thus, although the resolution adopted by the commission had not included this detail, the applicants remained responsible for actual mitigation, not merely the payment of money. This court concluded that "nothing in the statute or regulations . . . prevent[ed] a local wetlands commission from securing an agreement to provide off-site compensation for the loss of wetlands so long as the commission has considered the impact of the application on the subject property in accord with the policies outlined in §§ 22a-36 through 22a-45 of the General Statutes and the local regulations." Id., 722–23.

The facts of the present case are distinguishable from those of *Red Hill Coalition, Inc.* In the proposed plan in the present case, Stop & Shop, in essence, has removed itself from all responsibility by simply giving $25,000 plus a like amount of in-kind professional services to the commission, to be used at its discretion. Stop & Shop is not obligated to perform *any* mitigation under this plan. Neither the commission nor Stop & Shop has devised any proposal for the creation of new wetlands or the enhancement of existing wetlands. By providing monetary and in-kind contributions for an unspecified project in the future, Stop & Shop has, in essence, without remediation, destroyed wetlands. Permitting such a scenario is contrary to the legislative purpose of protecting and preserving this state's wetlands and watercourses.

Furthermore, such a condition prevents any meaningful review of the adequacy of the mitigation because

there is no plan of actual mitigation. The proposal is not sufficiently detailed to ensure that environmental consequences have been evaluated fairly. See *Robertson* v. *Methow Valley Citizens Council*, 490 U.S. 332, 351–53, 109 S. Ct. 1835, 104 L. Ed. 2d 351 (1989) (mitigation must be discussed in sufficient detail to ensure that environmental consequences have been evaluated fairly). "The importance of the mitigation plan cannot be overestimated. It is a determinative factor in evaluating the adequacy of an environmental impact statement. Without a complete mitigation plan, the decisionmaker is unable to make an informed judgment as to the environmental impact of the project . . . ." (Internal quotation marks omitted.) Id., 347–48. Although the United States Supreme Court in *Robertson* dealt with the National Environmental Policy Act and the corresponding environmental impact statement, the spirit of that legislation is sufficiently similar to compare to the act and the proposed plan in this case. Here, the commission cannot adequately assess whether the proposal would sufficiently offset the project impact because there is no mitigation plan. Upholding such nebulous mitigation would fly in the face of the purposes of the act.

In fact, the trial court in this case, while affirming the commission's approval of the permit application, noted that "[t]he very statement of the claim should alert the commission to the pitfalls of embarking on a course of requiring or encouraging cash contributions as a condition of issuance of permits. Such a practice would give rise to perceived and, conceivably, real abuse and would be contrary to public policy." The notion that money and its in-kind equivalent could present the sole obstacle to obtaining a permit would severely undermine the rationale for enacting the legislation and the ultimate purpose of protecting wetlands and watercourses.

Because we have concluded that the trial court improperly concluded that the commission could accept the payment of money and in-kind services as mitigation for the destruction of wetlands, we must next decide whether that condition was an integral part of the commission's decision to grant the permit. See *Vaszauskas* v. *Zoning Board of Appeals*, 215 Conn. 58, 66, 574 A.2d 212 (1990). In light of the purposes of the act, it is clear that, in general, mitigation measures are an integral component in the process of approving a permit that seeks to destroy wetlands. In the present case, the commission initially raised doubts regarding the sufficiency of the proposed mitigation measure, the construction of a detention basin on the property. In response to the commission's concern that the measure was insufficient, Stop & Shop proposed the payment of money and in-kind services, and the commission then accepted and integrated the proposal into the approval of the permit. Thus, we conclude, under the circumstances of the case, that the commission's decision to grant Stop & Shop's permit was reached only after the proposal for the payment of money and in-kind services was offered as mitigation and was, therefore, integral to the commission's decision-making process.

The judgment is reversed and the case is remanded with direction to render judgment sustaining the appeal.

In this opinion the other justices concurred.