## DINA JAEGER *v.* CONNECTICUT SITING COUNCIL*

Superior Court, Judicial District of New Britain
File No. CV-09-4020354-S

* Affirmed. *Jaeger* v. *Connecticut Siting Council,* 128 Conn. App. 243, 17 A.3d 484 (2011).

Memorandum filed March 15, 2010

*Proceedings*

*Gabriel North Seymour* and *Whitney North Seymour, Jr.*, pro hac vice, for the plaintiff.

*Robert L. Marconi,* assistant attorney general, for the named defendant.

*Bradford S. Babbitt, Kenneth C. Baldwin* and *John A. Poakeart,* for the defendant (intervenor Cellco Partnership).

COHN, J. The plaintiff, Dina Jaeger, an intervenor before the defendant Connecticut Siting Council (CSC), has appealed from a March 12, 2009 final decision of the CSC that approved an application by Cellco Partnership (Cellco) for a certificate of environmental compatibility relating to a cellular tower. See General Statutes § 16-50k. In its brief on the merits, Cellco raised the issue of the plaintiff's lack of aggrievement.[1] Because the plaintiff claimed to be aggrieved, but certain facts were not present in the record to establish aggrievement, the court conducted a hearing on aggrievement pursuant to General Statutes § 4-183 (i) on January 5, 2010.

The court first sets forth the relevant portions of the final decision of the CSC and then the additional findings of fact from the January 5, 2010 hearing. The

[1] General Statutes § 4-183 (a) requires that a party taking an administrative appeal from a final decision be aggrieved. Lack of aggrievement deprives the court of subject matter jurisdiction. *New England Rehabilitation Hospital of Hartford, Inc.* v. *Commission on Hospitals & Health Care,* 226 Conn. 105, 627 A.2d 1257 (1993).

CSC found as follows in its March 12, 2009 final decision.

1. On March 28, 2008, Cellco Partnership, doing business as Verizon Wireless (Verizon),[2] in accordance with provisions of General Statutes §§ 16-50g through 16-50aa, applied to the CSC[3] for the construction, operation, and maintenance of a wireless telecommunications facility at 188 Route 7 South in the Falls Village section of Canaan. The proposed site would be located on property that would be the future home of the Falls Village Fire Department.

\* \* \*

4. The party in this proceeding is the applicant. The intervenor is Dina Jaeger.

5. The purpose of the proposed facility is to provide service along Route 7 and portions of Route 112 and Route 126, as well as local roads in the southwest portion of the town of Canaan.

\* \* \*

8. Pursuant to General Statutes § 16-50*l* (b), Verizon provided notice to all federal, state and local officials and agencies listed therein.

\* \* \*

18. On October 23, 2007, Verizon notified the town of Canaan and met with its Chief Elected Official, First Selectman Patricia Allyn Mechare, providing copies of technical information regarding the proposed project.

19. Verizon provided copies of the technical information regarding the proposed project to the town of Salisbury First Selectman, Chief Elected Official, Curtis G. Rand, on October 23, 2007.

---

[2] This court uses instead the abbreviation "Cellco."

[3] This court uses instead the abbreviation "CSC."

20. Upon filing the application with the CSC, Verizon mailed copies of the application and attachments via certified mail, return receipt requested, to town of Canaan Officials including First Selectman Mechare; Mary M. Palmer, Town Clerk; Frederick J. Laser, Chairman of the Planning and Zoning Commission; John Holland, Chairman of the Zoning Board of Appeals; Michael O'Neil, Zoning Enforcement Officer; and Ellery W. Sinclair, Chairman of the Inland Wetlands Commission.

\* \* \*

22. On April 28, 2008, the town of Canaan Board of Selectmen (Board) sent a letter to the CSC regarding the proposed project. The letter expressed that the Board strongly supported Verizon's application due to the proposed facility's minimum impact on the surrounding area. The proposed facility would be in accordance with the general objectives of the town's Plan of Conservation and Development. The Board stated that the proposed facility would begin to close the gaps in wireless service where it is essential, along the Route 7 corridor. Verizon would provide space for the Falls Village Fire Department to locate on the tower, which the Board considers a benefit to public safety for the area.

23. In a letter received by the CSC on May 30, 2008, the town Planning and Zoning Commission recommended the proposed telecommunications tower be constructed as a monopole at 150 feet agl, rather than an artificial tree at 157 feet agl based on a consensus that the artificial tree tower would not be in keeping with the rural character and integrity of the town.

24. The town of Canaan Inland Wetlands/Conservation Commission (Commission) submitted comments to the CSC in a letter dated June 5, 2008. The Commission found that there would be no intrusion upon any wetland or watercourse due to the construction or operation of the proposed project.

* * *

40. The proposed site is located on a 7.15 acre parcel at 188 Route 7 South in Falls Village. The property is owned by the Falls Village Volunteer Fire Department, Inc., and is the future home of the Falls Village Fire Department firehouse. Figure 1 of this document is an aerial photograph depicting the location of the proposed site. Figure 2 of this document is a site plan for the proposed site. [Neither is included in the court's decision.]

41. The parcel is zoned Residential/Agricultural. The Canaan Zoning Regulations do not contain preferences for siting telecommunications facilities.

42. The proposed site is within the Housatonic River Zone-Outer Corridor. The Housatonic River Overlay Zone, as defined by the Housatonic River Commission's Housatonic River Management Plan, is a flood prone corridor of land adjacent to the Housatonic River. The land is environmentally sensitive, and contains valuable natural resources. The Outer Corridor of the Housatonic River Overlay Zone is the area essentially between the limit of the 100 year flood zone and the top of the valley ridge.

43. The proposed tower would be located in the center portion of the property at an elevation of approximately 655 feet above mean sea level. The site is wooded with an area cleared for a future fire department building and associated parking areas. The proposed tower would be northwest of and behind the future fire department building and approximately 290 feet west of Route 7.

44. The proposed facility would include a 150 foot monopole, disguised as a pine tree, within a 100 foot by 100 foot leased area. The top of the simulated branches would extend to 157 feet agl. The proposed tower would

accommodate the antennas of four carriers as well as town and Falls Village Fire Department antennas. Verizon would construct the tower in accordance with the American National Standards Institute TIA/EIA-222-F Structural Standards for Steel Antenna Towers and Antenna Support Structures.

* * *

57. Intervenor Dina Jaeger's residence is located approximately 1290 feet east of the proposed tower. Intervenor Jaeger also co-owns an undeveloped parcel of property directly across Route 7 South from the proposed site at 167 Beebe Hill Road, approximately 380 feet east of the proposed tower.

* * *

61. No known federally listed or proposed, threatened or endangered species or critical habitat occur on the host property.

62. Federal or State Endangered or Threatened or State Special Concern species that are known to occur outside of the host property but within a 984 foot (300 meter) radius of the proposed site include the Endangered plant species *Ribes triste* (Swamp Red Currant), the Threatened *plant species Petasites frgidus var. palmatus* (Sweet Coltsfoot) and the *Passerculus sandwichensis* (Savannah Sparrow), a state Special Concern bird species.

63. The State listed Special Concern Species *Passerculus sandwichensis* (savannah sparrow) has been known to occur in this portion of Canaan; however, the proposed site is unlikely to affect this bird species due to the primarily wooded vegetation on the property. The savannah sparrow uses grassland areas. The Department of Environmental Protection recommended the minimization of tower lighting and lighting

of equipment shelters and metering areas to the greatest extent possible.

64. The State listed Endangered species *Lota Lota* (burbot) is a fish species that has been recorded at the Hollenbeck River, which is greater than two miles from the proposed site. The proposed facility would not affect this endangered species.

\* \* \*

69. Properties surrounding the host property include oak forest, sawmill yard and business development, residential, upland meadow and cultivated field.

70. No wetlands are located within 200 feet of the proposed site. An intermittent watercourse was identified approximately 240 feet south of the proposed compound. An additional intermittent watercourse was identified approximately 260 feet north of the proposed compound. Construction of the proposed site is not expected to adversely affect either intermittent watercourse.

\* \* \*

74. The CSC has reviewed the studies introduced by the Intervenor. Exhibit 51 is the U.S. FWS Briefing Paper, which has been discussed in Findings Nos. 66 and 67. [Shows effect "virtually unknown."] Exhibit 7 is a study on mice: the CSC finds it does not provide credible evidence that radiofrequency (RF) emissions kill mice, birds or other wildlife. Exhibit 6 regarding White Storks does not establish that RF emissions proximately kill such storks. Exhibit 5 is a study regarding House Sparrows and does not demonstrate that RF emissions proximately kill such birds. The same is true of Exhibit 4. Exhibits 1, 2 and 3 do not demonstrate that RF emissions proximately kill the studied birds. In summary, the CSC does not believe that the submitted studies clearly demonstrate that RF emissions from

wireless telecommunications towers, that are in compliance with Federal Communications Commission regulations, proximately cause the deaths of protected birds or their eggs.

75. The CSC notes that the Intervenor has introduced numerous exhibits alleging health risks to human beings from RF emissions. The CSC notes, however, that the RF emissions from the proposed tower would be fully in compliance with Federal Communications Commission regulations. (See Finding Nos. 72-73.) Consequently, the CSC would be barred under Federal law, 47 U.S.C. § 332 (c) (7) (B) (i), from basing any rejection of the pending application on these human health concerns. Further, the binding case law interpreting this statutory provision has been explicit.

76. The proposed tower would be visible year-round from approximately twenty-four acres within a two mile radius of the site. The tower would be seasonally visible from an additional approximately forty-six acres within a two mile radius of the site.

* * *

88. The existing signal level in the area of the proposed site ranges from-86dBM to-104dBm, at both PCS and cellular frequencies.

89. A coverage gap exists in Verizon's PCS and cellular coverage between the existing 130 foot tree tower at 477 Route 7 in Sharon and the 195 foot tower off Lower Road in North Canaan.

90. The proposed facility would provide approximately 2.6 miles of reliable PCS coverage to Route 7, 1.1 miles to Route 112, and 1.2 miles to Route 126. The overall PCS footprint of coverage from the proposed tower would be 2.92 square miles.

91. The proposed facility would provide approximately 3.45 miles of reliable cellular coverage along Route 7, 1.25 miles along Route 112, and 1.3 miles along Route 126. The overall cellular footprint of coverage from the proposed tower would be 10.6 square miles. (Return of Record, ROR, Item XX.1.)

At the hearing before this court on January 5, 2010, the plaintiff presented evidence first from Ross W. Grannan, a real estate appraiser. Grannan testified that the marketability of the plaintiff's property would be diminished by 20 to 30 percent if the cellular tower was erected. On the other hand, Grannan's testimony is subject to question. He did not take into account that the tower would be disguised, that its height would not exceed 100 feet, and that lighting would be controlled at the site.

In addition, he did not factor into valuation the existence of numerous power lines affecting the view from the plaintiff's property, the existence of trees as a natural camouflage, or the presence of Route 7, a busy thoroughfare, at the site. He also did not evaluate visibility where, as here, there is a low ridge line which covers most of the tower. He relied upon one sale of commercial property that might have been affected by the existence of a cellular tower.

Finally, Grannan testified that the plaintiff's house was 1300 feet from the tower placement. He also testified that there were five to six houses on the plaintiff's street that would have a view of the tower, as well as ten to fifteen other houses in the Falls Village section of Canaan that would have a direct view of the tower.

The second witness called by the plaintiff was Evan Pritchard, an adjunct professor at Pace, Marist, and Vassar colleges. The court found him to be an expert on Native American culture. Pritchard testified that the

plaintiff had an important mentor in the Cheyenne community, Eugene Blackbear, Sr. From Blackbear, Sr., and others in the Native American community, the plaintiff has become skilled in beadmaking. She is also interested in the spirit world revered by Native Americans. This includes reverence for birds such as eagles and hawks—the eagle is a pure communicator and the hawk foreshadows storms. Some of these eagles are endangered species.

The court did not allow the witness to respond to questions about the Indian Removal Act of 1800, as this testimony was not germane to the issue of aggrievement. The court also granted Cellco's objection to specific questions of Pritchard about the scientific exhibits (see findings of fact, final decision, 74-75). These exhibits, a part of the record, were introduced by the plaintiff before the CSC to show that the proposed tower would cause injury.[4] The evidence sought by the plaintiff from Pritchard was the relationship between the scientific studies and harm to Native American culture. Pritchard, however, is not an expert on either environmental or health science; there was no showing that he would understand the technicalities of these studies.[5]

The court did offer to allow the plaintiff, in lieu of using the scientific material, to ask the witness about species in danger and the impact on Native American culture, but the plaintiff declined to ask the witness

[4] The CSC concluded in the final decision that the plaintiff's exhibits were not scientifically valid.

[5] In her posthearing aggrievement brief of February 8, 2010, the plaintiff argues again that the court erred in refusing to let Pritchard testify regarding the scientific exhibits. She asks again that the court admit the studies as full exhibits. She states that there was no time to obtain other expert scientific testimony for the January 5, 2010 hearing. But the plaintiff was given notice of the January 5 hearing on December 3, 2009. In addition, these studies were made part of the record before the CSC; the court analyzes them below in discussing the plaintiff's classical aggrievement.

about this topic. (Transcript, aggrievement hearing, January 5, 2010, p. 85.) The court on its own inquired about the birds possibly endangered by cellular towers. Pritchard stated: "And if there is any danger whatsoever to [wildlife], it's an obvious problem of conscience for a religious person." (Id., p. 87.)

The plaintiff herself was the final witness. She expressed distress over the interference with the view from her property to be caused by the proposed tower. She also related her religious beliefs about communicating with birds such as hawks, eagles and woodpeckers. The birds will be less likely to fly over her property after the tower is erected. She is also fearful of damage to her health (already impaired by Lyme disease, emphysema, and diabetes) and the health of her family. Finally, she resented the interference with her natural enjoyment of the land and her duty as a keeper of the land.

The court must decide whether there is evidence in the record and in the testimony to satisfy the aggrievement requirement. There are two types of aggrievement. As our Supreme Court recently stated: "Two broad yet distinct categories of aggrievement exist, classical and statutory. . . . Statutory aggrievement exists by legislative fiat, not by judicial analysis of the particular facts of the case. In other words, in cases of statutory aggrievement, particular legislation grants standing to those who claim injury to an interest protected by that legislation. . . .

"With respect to classical aggrievement under the [Uniform Administrative Procedure Act (UAPA), General Statutes § 4-166 et seq.], the plaintiffs must make a two part showing. First [they] must demonstrate a specific, personal and legal interest in the subject matter of the [controversy], as opposed to a general interest that all members of the community share. . . . Second,

[they] must also show that the [alleged conduct] has specifically and injuriously affected that specific personal or legal interest." (Citations omitted; internal quotation marks omitted.) *Sastrom* v. *Psychiatric Security Review Board*, 291 Conn. 307, 326–27, 968 A.2d 396 (2009).

The plaintiff claims three reasons why she is statutorily aggrieved. The first is that she was granted intervenor status by the CSC under its statutes and fully participated in its proceedings. Aggrievement on this ground has been rejected by the appellate courts. *New England Rehabilitation Hospital of Hartford, Inc.* v. *Commission on Hospitals & Health Care*, 226 Conn. 105, 132, 627 A.2d 1257 (1993); see also *Sastrom* v. *Psychiatric Security Review Board*, supra, 291 Conn. 327; *Concerned Citizens for the Preservation of Watertown, Inc.* v. *Planning & Zoning Commission*, 118 Conn. App. 337, 344, 984 A.2d 72 (2009) ("[m]ere status . . . as a party or a participant in a hearing before an administrative agency does not in and of itself constitute aggrievement for the purposes of appellate review" [internal quotation marks omitted]), cert. denied, 294 Conn. 934, 987 A.2d 1028 (2010).

The plaintiff further argues that she is an abutting landowner. By General Statutes § 8-8 (a) (1), owning land within 100 feet of any portion of land involved in a zoning decision gives the landowner statutory standing in a zoning appeal. This is not a zoning appeal, however. It is an appeal under the UAPA as authorized by General Statutes § 16-50q: "Any party may obtain judicial review of an order issued on an application for a certificate [by the CSC] . . . in accordance with the provisions of § 4-183. . . ."

Finally, the plaintiff claims statutory aggrievement under the environmental intervenor statute, General Statutes § 22a-19. This statute has certain requirements

for its applicability, developed in *Nizzardo* v. *Zoning Commission*, 259 Conn. 131, 788 A.2d 1158 (2002). As the Appellate Court stated in *Keiser* v. *Zoning Commission*, 72 Conn. App. 721, 725, 806 A.2d 103, cert. denied, 262 Conn. 909, 810 A.2d 274 (2002): "In *Nizzardo*, our Supreme Court determined that § 22a-19 (a) permits a party to intervene in an administrative proceeding to raise environmental issues when two conditions are met. First, the *Nizzardo* court concluded that § 22a-19 grants standing to intervenors to raise only those environmental concerns that are within the jurisdiction of the particular administrative agency conducting the proceedings into which the party seeks to intervene. . . . Second, the *Nizzardo* court determined that to qualify as a verified pleading under § 22a-19, a petition must contain specific factual allegations setting forth the environmental issue that the intervenor intends to raise." (Internal quotation marks omitted.)

Here, the plaintiff did not satisfy this second requirement. Her motion to intervene does not state that it is taken in whole or in part under § 22a-19. In addition, the motion is not a verified pleading. (ROR, Item VI.1.) The appeal to the Superior Court states that it is "taken pursuant to [UAPA] § 4-183 and § 16-50q" and does not mention § 22a-19. (ROR, Item XXI, para. 2.) The plaintiff therefore cannot claim statutory standing based on § 22a-19. See *Bingham* v. *Dept. of Public Works*, 286 Conn. 698, 704–705, 945 A.2d 927 (2008): "The plaintiffs do not point to, and we do not find, any explicit language in [§ 22a-19] that demonstrates the legislature's intent to alter the aggrievement requirement for appeals brought pursuant to the UAPA if the appealing party happens to raise an environmental issue. Accordingly we conclude that the plaintiffs have not established statutory aggrievement for their appeal under the UAPA."

The plaintiff argues that *Branhaven Plaza, LLC* v. *Inland Wetlands Commission*, 251 Conn. 269, 276 n.9,

740 A.2d 847 (1999), supports her aggrievement argument. But *Branhaven Plaza, LLC,* merely states that if a proper notice to intervene is given under § 22a-19, then the intervenor has environmental standing. *Branhaven Plaza, LLC,* does not support general aggrievement or any aggrievement claim based on involvement in the CSC proceedings.

The court next discusses each of the plaintiff's claimed bases for classical aggrievement. As stated above, to satisfy classical aggrievement, the plaintiff must demonstrate a specific personal or legal interest in the legal controversy as opposed to a general community interest, and that interest must have been adversely affected. See *Sastrom* v. *Psychiatric Security Review Board,* supra, 291 Conn. 327.

The court first holds that one cannot be aggrieved merely because of "constitutional rights" alleged to have been violated by the CSC. A similar argument was made and rejected in *Concerned Citizens for the Preservation of Watertown, Inc.* v. *Planning & Zoning Commission,* supra, 118 Conn. App. 345: "[T]he plaintiff asks this court to recognize a new form of aggrievement whereby a petitioning party has standing to vindicate a [constitutional] procedural due process right in an administrative appeal . . . . First and foremost, the plaintiff has provided no authority for its procedural aggrievement proposal." (Internal quotation marks omitted.)

The court now turns to the plaintiff's claim under the Federal Religious Freedom Restoration Act of 1993, 42 U.S.C. § 2000bb et seq. (RFRA), that her religious beliefs override the decision by the CSC to grant the certificate of environmental compatibility. The court rejects this claim for two reasons. First, the plaintiff's religious beliefs were never specifically raised before the CSC, either in her request for intervention, her testimony or

in briefs submitted to the CSC. An argument that could have been raised in the administrative proceedings cannot now be raised in a Superior Court administrative appeal. *Burnham* v. *Administrator*, 184 Conn. 317, 323, 439 A.2d 1008 (1981). In addition, there is no allegation of religious beliefs in the complaint to this court.

Secondly, the United States Supreme Court has invalidated the RFRA as applied to the states, holding that the RFRA exceeded Congress' power under the Enforcement Clause of the Fourteenth Amendment. *Boenre* v. *Flores*, 521 U.S. 507, 117 S. Ct. 2157, 138 L. Ed. 2d 624 (1997); see also *Navajo Nation* v. *United States Forest Service*, 535 F.3d 1058, 1067 n.10 (9th Cir. 2008), cert. denied, 556 U.S. 1281, 129 S. Ct. 2763, 174 L. Ed. 2d 270 (2009).

Analyzing the claim from the perspective of "freedom of religion," under the First and Fourteenth amendments, this claim has also been rejected. The Supreme Court drew this conclusion in a case involving commercial logging on property held sacred by Indians. Free exercise of religion does not allow the claimant to dictate to the government whether it may give permission for use of property. "Whatever rights the Indians may have to the use of the area, however, those rights do not divest the Government of its right to use what is, after all, its land." *Lyng* v. *Northwest Indian Cemetery Protective Assn.*, 485 U.S. 439, 453, 108 S. Ct. 1319, 99 L. Ed. 2d 534 (1988).

The next claimed aggrievement is that the tower will reduce the plaintiff's property values. This claim also fails for two reasons. First, as indicated above, the plaintiff's witness, Grannan, was not credible. His testimony as to the reduction in value was wholly speculative. The court concludes as did the Superior Court in *Goldfisher* v. *Connecticut Siting Council*, 95 Conn. App. 193, 199, 895 A.2d 286 (2006), that the plaintiff failed

to "present any testimony or evidence from which it could have gleaned the extent of the claimed effect on the value of the plaintiff's property occasioned by construction of the tower." On appeal, the Appellate Court held that the Superior Court's finding that the plaintiff's evidence was "speculative" and that therefore the plaintiff had not demonstrated aggrievement "was not clearly erroneous. Because specific detriment to a legal interest is the lynchpin of classical aggrievement, the court properly determined that the plaintiff did not have a cognizable interest in the decision of the siting council." Id., 199–200.

In addition, Grannan testified that five to six homes on the plaintiff's street were located similarly and ten to fifteen persons in town would have views of the tower. Thus, the plaintiff does not have a specific personal interest, not shared by the community, with regard to her claimed diminished property value. See *Connecticut Business & Industry Assn., Inc.* v. *Commission on Hospitals & Health Care*, 214 Conn. 726, 730, 589 A.2d 356 (1990) (aggrieved party must have specific personal interest in subject matter, as distinguished from concern of all members of community).

The plaintiff also claims aggrievement because her picturesque views from second-story rooms in her house will be affected by the placement of the tower. She also maintains that the tower will interfere with her recreational birdwatching. But, again, interference with her aesthetics is no different from anyone else in the community, and aggrievement is not found.

In *Sandor* v. *Jordan*, Superior Court, judicial district of Stamford-Norwalk, Docket No. CV-05-4007556 (May 24, 2006) (*Hon. William B. Lewis*, judge trial referee), the court granted a motion to dismiss for lack of aggrievement. The plaintiff was protesting an order by the tree warden requiring the removal of four honey

locust trees at an intersection in New Canaan. Judge Lewis stated: "Here, the complaint states that the trees are healthy and should be preserved for their aesthetic qualities. These allegations do not support a finding of aggrievement. They support only an interest common to any member of the public who is near the New Canaan Post Office and not any specific legal interest personal to the plaintiffs." Merely being adjacent to the site of a project is also insufficient. See *Nizzardo* v. *State Traffic Commission*, 55 Conn. App. 679, 687, 739 A.2d 744 (1999),[6] aff'd, 259 Conn. 131, 788 A.2d 1158 (2002).

Following up on this point, the plaintiff never made a claim about an interference in her beliefs in Native American culture before the CSC. She never produced evidence as she did with the evidence of Professor Pritchard at the hearing before this court. As indicated in the *Burnham* case, she is precluded from making this argument here. Also, the plaintiff testified that she shares her interests in the sweat lodge and bird culture with others in the community. Her interests in these matters are too general in nature to give her standing. See id.

The plaintiff also relies on the dangers posed by the radio frequency (RF) radiation that would be generated by the tower. She claims that her health, which is compromised, that of her family, as well as wildlife will be adversely impacted. The CSC, over objection, received a series of studies,[7] now part of the record, during the public hearing on Cellco's application. The CSC found in finding of fact 74 that these studies were without

---

[6] While the Supreme Court issued a ruling on another portion of *Nizzardo* as decided in the Appellate Court, the portion of the Appellate Court decision on classical aggrievement was not at issue in the Supreme Court. See *Nizzardo* v. *State Traffic Commission*, supra, 259 Conn. 135.

[7] These are the same studies that the court refused to receive in evidence at its January 5, 2010 hearing, as they were already part of the record.

merit. The court defers to this factual finding. See *Wheelabrator Lisbon, Inc.* v. *Dept. of Public Utility Control*, 283 Conn. 672, 690–91, 931 A.2d 159 (2007) ("[n]either this court nor the trial court may retry the case or substitute its own judgment for that of the administrative agency on the weight of the evidence or questions of fact" [internal quotation marks omitted]); see also *Goldstar Medical Services, Inc.* v. *Dept. of Social Services*, 288 Conn. 790, 831, 955 A.2d 15 (2008) (court must defer to trier of fact's assessment of witnesses, even experts).

Moreover, the plaintiff, other than providing a series of reports to the CSC, did not call any witness to explain a correlation between these reports and the tower in question. When asked a question about the reports, she responded that she did not know any details. (ROR, Item XVI, Transcript, July 31, 2008, p. 180.)

Finally, finding aggrievement based on RF would contradict 47 U.S.C. § 332 (c) (7) (B) (iv), which prohibits a state from considering RF in cellular tower placement, to the extent that such facilities comply with the Federal Communications Commission's regulations concerning these emissions. See *Sprint Spectrum L.P.* v. *Mills*, 283 F.3d 404, 416 (2d Cir. 2002).

The court concludes that while the plaintiff believes in good faith that the construction of a cellular tower in her town will impact her health and life's enjoyment, her apprehensions do not satisfy the demands of classical aggrievement. See *Walls* v. *Planning & Zoning Commission*, 176 Conn. 475, 477, 408 A.2d 252 (1979).

The appeal is therefore dismissed.